# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

TERRY KINZIE,                                    )
                                                 )
                    Plaintiff,                    )
vs.                                              )          NO. CIV-16-1463-HE
                                                 )
SONNY PERDUE, SECRETARY, U.S.                    )
DEPARTMENT OF AGRICULTURE, *et al.*,             )
                                                 )
                    Defendants.                   )

## <u>ORDER</u>

Plaintiff Terry Kinzie sued the United States Department of Agriculture ("USDA"),

the Secretary of Agriculture, the Conservation of the Natural Resources Conservation

Service ("NRCS"),[1] and the Chief and Acting Chief of the NRCS, asserting claims for age

discrimination and retaliation under the Age Discrimination in Employment Act of 1967

("ADEA"). The court previously dismissed plaintiff's claims against all defendants except

for the Secretary of Agriculture, granted the Secretary summary judgment on two of

plaintiff's three grounds for his retaliation claim – hostile work environment and

constructive discharge[2] -- and dismissed his requests for compensatory and punitive

---

[1] *The NRCS is an agency within the USDA. Although not expressly stated in the second amended complaint, plaintiff proceeded against the individual defendants only in their official capacities.*

[2] *Defendants asserted plaintiff had three separate retaliation claims, rather than one claim with multiple grounds supporting it. Because "[e]ach discrete incident of alleged discrimination or retaliation constitutes its own unlawful employment practice for which administrative remedies must be exhausted,"* <u>Green v. Donahoe</u>*, 760 F.3d 1135, 1140 (10th Cir. 2014), vacated and remanded on other grounds sub nom.,* <u>Green v. Brennan</u>*, 136 S. Ct. 1769 (2016) (internal quotation marks omitted), and, for purposes of clarity, the court referred to the different grounds as separate claims. However, as only one basis for plaintiff's retaliation claim remains to be resolved, the court will refer to it as plaintiff's retaliation claim.*

damages.  *See* Doc. #22.  The Secretary now seeks summary judgment on plaintiff's remaining disparate treatment and retaliation claims, which are based on his allegations that he was not hired for a newly created position because of his age and that his performance review was changed in retaliation for reporting the age discrimination.

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  "A genuine dispute as to a material fact 'exists when the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party.'"  Carter v. Pathfinder Energy Servs., Inc., 662 F.3d 1134, 1141 (10th Cir. 2011) (quoting Zwygart v. Bd. of Cnty. Comm'rs, 483 F.3d 1086, 1090 (10th Cir.2007)).  Considering defendant's motion under this standard, the court concludes it should be granted with respect to plaintiff's discrimination claim and denied with respect to his retaliation claim.

<u>Background</u>[3]

In 2015, as part of result of a nationwide reorganization of administrative and other functions, NRCS created a new position, that of Business Services Specialist ("BSS"), in the Assistant State Conservationist for Management and Strategy ("ASTC(M&S)") section of NRCS.  According to the job announcement, the person who was hired for the position would "perform[] a wide variety of duties and assignments in support of business

---

[3] *The parties separated their statements of material facts into two sections relating to plaintiff's two claims.  The court has done likewise.*

2

operations and administrative services necessary to accomplish the mission responsibilities of the State or Area office and the NRCS." Doc. #44-12, p. 2.[4] Thirty-three BSS positions were to be filled across the country, with one in Oklahoma. Plaintiff applied for the Oklahoma position. At the time he was over 40. He had been an Oklahoma NRCS employee since 2009, starting as a contract specialist and eventually becoming a realty officer. The person hired instead of plaintiff, Joshua Ketch, another NRCS employee, was in his 20's. Ketch had worked at NRCS full-time as a rangeland management specialist since 2010.

The selection process was straightforward. The Office of Personnel Management ("OPM") initially reviewed the applications and determined who met the minimum qualifications. It prepared a "Merit Promotion Certificate of Eligibles," and forwarded the list of candidates to NRCS with instructions that any person on the list could be selected. No NRCS employees were involved in this initial process. Both plaintiff's and Ketch's names were on the list, along with ten others. The selecting official does not have to recheck or verify the qualifications of the persons appearing on the Certificate of Eligibles.

In conjunction with the administrative reorganization, NRCS sent out suggested procedures to be used in filling the BSS and other new positions, including convening a Qualifications Review Panel ("QRP"). The selecting official could use a QRP, instead of handling the selection process by himself if, "in collaboration with the Human Resources (HR) Specialist," he determined it was "needed to evaluate the best qualified applicants."

---

[4] *Page references to briefs and exhibits are to the CM/ECF document and page number.*

Doc. #44-16, p. 1. Factors to be considered in deciding if a QRP should be used included "the complexity and organizational level of the vacant position and the number of best qualified applicants, both competitive and/or non-competitive, received in response to the vacancy announcement." Id. at p. 2.[5] If a QRP was used, the selecting official, "in consultation with the HR Specialist" designated subject matter experts to serve as panel members. Doc. #44-16, p. 2. The panel, which would have "expert knowledge about what it takes to do the job," would determine which applicants were most qualified and should "advance to interview." Doc. #44-15, p. 1. According to the suggested procedures, the SME panel should "compare applicant resumes and supporting materials to the skills and abilities in the assessment questions tool." Id.

Oklahoma Assistant State Conservationist for Management and Strategy ("OASTC (M&S)") Jamey Wood was the selection official for the BSS position in Oklahoma. He wanted to hire someone who "had exceptional interpersonal skills, who could work with a wide and diverse number of people and handle a large and complex workload under stressful conditions, a quick learner and someone with administrative skills and effective problem solving skills." Doc. #44, p. 18, ¶ 13. The position description listed these skills as among those required for the job. See Doc. #44-11, p. 4.

_____

[5] Plaintiff refers to an email Wood received from another NRCS employee in Kansas about hiring procedures. He states that "Wood reached out" to the employee "to inquire about how to handle the hiring process, instead of following the protocols provided to him." Doc. #53, p. 9, ¶2. Defendant objects to the email on multiple grounds. The court agrees that it is inadmissible, but also notes that it fails to demonstrate Wood's "subjective[] determin[ation] not to follow Defendant's own protocol for the purpose of allowing the younger candidate to move on in the selection to where he could ensure his appointment as Business Services Specialist (BSS)." Id. at p. 8, ¶2.

Wood decided to interview all candidates rather than use a Qualifications Review Panel because the number of eligible applicants for the Oklahoma BSS position – 12 -- was manageable.[6]   The panel was designed to be used when the "applicant pool was too large or diverse for the selecting official to evaluate."   Doc. #44-6, p. 3, ¶15.  While he did not use a QRP, Wood did use an interview panel.[7]   After consulting with the State Conservationist, Gary O'Neill,[8] he selected Bill Porter, who had been the acting Oklahoma State Conservationist, and Steve Glasgow, who was the State Resource Conservationist, to serve on the panel.  All panel members had some prior contact with both plaintiff and Ketch.

Wood divided the job selection process into three categories: interviews, resume reviews and references.  All eligible candidates were interviewed either in person or by phone.  Both plaintiff and Ketch were interviewed in person. Questions were divided among the panel members, who asked the same questions of each candidate.  Each panel member then rated the candidate's response, using a score of 1, 3 or 5, with 5 being the highest rating. The panel members then compiled a table of their scores. Wood totaled the raw scores of all three panel members from the interviews.  Ketch scored the highest with

---

[6] As will be discussed subsequently, plaintiff contends Wood improperly decided not to use a QRP because he made the decision unilaterally, without "collaborating with HR."  Doc. #53, p. 7.

[7] This, too, was a suggested procedure.  See Doc. #44-15, p. 1("Selecting Officials are encouraged to establish an interview panel of 3 to 5 . . . to assist with interviews.").

[8] The parties disagree as to the extent of O'Neill's involvement, if any, in the selection of the interview panel.  The dispute is not material for purposes of plaintiff's ADEA claim as plaintiff does not explain how O'Neill's participation in the process led to discrimination against plaintiff based on his age.

97 total points; Kinzie was next, with 93 points. Wood then converted the scores to a 5-point scale. Both Kinzie and Ketch received 5 points.

Next Wood reviewed the candidates' resumes, using a ranking of low, medium and high. In ranking the resumes, Wood considered eight factors or skills he was looking for in a BSS. These were essentially the same skills mentioned earlier which Wood was seeking in the applicants for the BSS position – a problem solver, a team leader, someone who could handle a large workload under pressure, an effective communicator who could work well with diverse individuals and a quick learner who could adapt to change. *See* Doc. Nos. 44-25; 44-26. Ketch's score was a H-, which converted to a 4.5 on a 5-point scale. Kinzie's was a M+, which converted to a 3.5.[9]

The last step in the selection process was consideration of candidates' references.[10] The job announcement did not request references and Kinzie did not list any, although Ketch did. Woods testified that he tried to "get as many commonalities between candidates and references as [he] could." Doc. #44-6, p. 5, ¶23. He stated that "[g]iven the size of our organization, it would have been difficult to have found manager references that did not have some connection or contact with one or more candidates." *Id.* at ¶24. Wood acknowledged that he did not contact plaintiff's current direct supervisor, Janette Jensen,

---

[9] *During the review process, Wood used a plus or minus to reflect a question as to whether the score should move up or down. The same signs were used during the interview process.*

[10] *Kinzie asserts that "references were not a required part of the online submissions for the position of BSS." Doc. #53, p. 10, ¶5. However, he offers no evidence that they could not be considered or that they were considered to discriminate against him because of his age.*

because he had worked with her and did not respect her "opinions, practices or the way she did business." Doc. #44-6, p.6, at ¶25.[11] He did, though, contact one of Kinzie's former supervisors, Renee Gardner, who was not listed by Ketch, and another resource conservationist, Melanie Oliver, whom Ketch also did not list but who had worked with both Kinzie and Ketch. Using the same scoring method as before, Ketch received a reference score of 5.0, while Kenzie received a score of 3.5.

When the scores were tallied, Ketch had the top score of 14.5 points and Kinzie had the second highest score of 12 points. Wood selected Ketch to be the BBS based on his score.

Kinzie received an annual performance appraisal. The rating year for most NRCS employees is the fiscal year, October 1 through September 30 of the next calendar year. Plaintiff was rated on three critical elements: (1) civil rights, EEO, and diversity and inclusion; (2) mission results and (3) customer service.[12] The possible ratings, from high to low, were: exceeds fully successful, meets fully successful, and does not meet fully successful. The combined element ratings then determined Kinzie's summary rating, of which there were five possibilities. From highest to lowest they were: outstanding, superior, fully successful, marginal and unacceptable.

The employee's direct supervisor usually prepares his or her performance appraisal. The employee's second line supervisor is the reviewing official for the appraisal. The

---

[11] *Plaintiff asserts it was because of a personality conflict. See Doc. #53, p. 14.*

[12] *Because each element was "critical," an unacceptable performance on any one would result in a determination that his overall performance was unacceptable.*

appraisal is not official until the reviewing official approves or "sign[s] off on the rater's evaluation." Doc. #44, p. 24, ¶31.

From 2013 through 2015, Janette Jenson, Kinzie's first line supervisor, prepared his appraisals and Oklahoma State Conservationist O'Neill was his reviewing official. O'Neill, as manager of the Oklahoma NRCS, either rated or reviewed approximately one third of the NCRS's Oklahoma employees in 2015.

The reviewing official has multiple responsibilities. Among them are:

   a. Establishing a performance culture that supports a high-performing organization through management of individual and organization performance.
   b. Ensuring that rating officials carry out their performance management responsibilities and evaluate the rating officials to ensure accountability for performance management.
   c. Reviewing and approving the performance plans and ratings of his or her subordinate rating officials to ensure consistency, fairness, objectivity and completeness and ensuring that plans reflect the overall needs and goals of the agency.

Doc. #44, p. 24, ¶ 30.

The reviewing official may change an employee's rating after discussing it with the rating official if the change is "consistent with the performance and the employee's accomplishment." Doc. #44-31, p. 2, ¶7. NRCS policy governing performance appraisals provides that the "ratings may not be communicated to the employees before they are approved by the final reviewer." Doc. #44-36, p. 14.[13] However, around October 1, 2015, before O'Neill reviewed and signed off on Kinzie's performance review, Jensen met with

_____

[13] *However, the policy also provides that "the supervisor and the employer should discuss the employee's performance before the rating has been determined." Doc. #44-36, p. 14.*

Kinzie and told him he would receive a summary rating of superior for his 2015 performance appraisal. Jensen later proposed that Kinzie receive an "exceeds fully successful" rating for both the mission results and customer service elements. She recommended he receive a "meets fully successful" rating for the remaining element (civil rights, EEO and diversity and inclusion). The combination of two "exceeds fully successful" and one "meets fully successful" ratings would have resulted in a summary rating of "superior" for the 2015 rating year.

When O'Neill reviewed Kinzie's proposed 2015 performance appraisal, he was aware that Kinzie had filed an administrative EEO age discrimination complaint challenging Ketch's selection for the BSS position. O'Neill testified that he had concerns about the "exceeds fully successful" rating Jensen had given Kinzie for the customer service element. He stated that during the rating year he received numerous complaints from NRC field supervisors and employees about Kinzie's handling of problems that arose with respect to three buildings which NRCS leased in McAlester, Pauls Valley and Eufaula. The employees had to be relocated and the leases were terminated. Kinzie was responsible for the building leases.

According to O'Neill, he participated in several meetings, which took place both in person and over the telephone, with field employees who worked in the buildings. He testified that the employees told him Kinzie was not responsive to their concerns – he did not listen to, act on or appear to be concerned about their complaints. Doc**.** #44-5, p. 3. ¶13. O'Neill stated that "[t]hey believed he was more concerned with maintain[ing] a good relationship with the common landlord of the problem leases/buildings than getting lease

issues with the buildings resolved." *Id*. O'Neill said he did not hold Kinzie accountable for the problems with the leases or buildings, but was concerned "about customer service and the complaints [he] had received and the negative impressions and perceptions that the field had of Kinzie." *Id*. at ¶14. O'Neil felt that Kinzie was representing the state NRCS leadership "[i]n his dealings with the field on lease matters." *Id*. He was concerned about the message an "exceeds" rating in customer service would send to the organization when there had been so many customer complaints.

While O'Neill claims he spoke with Kinzie about the perceptions NRCS field employees had regarding plaintiff's work during the summer and fall of 2015, Kinzie denies that any discussions occurred. He contends no reports were made to his supervisor, Jensen, and that O'Neill never talked to him about his performance until after Jensen gave him the summary superior rating. He also denies being aware that "anyone took any issue with the way he was handling the customers at the three respective leases." Doc. Nos. 53, p. 18; 53-3, p. 13. According to plaintiff, there had been water and mold problems with the leased buildings for several years, which had been conveyed to NRCS leadership. Plaintiff asserts that it was only "after a news story broke concerning mold in the buildings, [that] O'Neill became involved in the subject leases." Doc. #53, p. 18.

Although plaintiff asserts that O'Neill told both him and Jensen that he disagreed with the rating solely because of the mold issues, Jensen testified that O'Neill advised her it was "because of the mold issues they were having and that there were concerns Terry did not provide good customer service to the field offices." Doc. #53-9, p. 8, ¶11. She also stated:

> I told Gary the mold issues were not something under Terry's control and was not under Terry's performance standards and would not be a fair assessment of his performance. We talked about communications and I asked Gary if he had recent specific feedback from individuals saying that Terry did not provide good customer service. Gary did not have anything in writing.

*Id*.

O'Neill decided that the customer service element of Kinzie's 2015 performance evaluation should be "meets fully successful" rather than "exceeds fully successful" and he instructed Jensen to make the change. He did so, he stated, because he "believed it would be unfair to other employees in the state and would be sending the wrong message if [he] were to approve the 'exceeds' rating in customer service." Doc. #44-5, p. 4, ¶18. He then asked field supervisors to "memorialize the comments and concerns that they had expressed to him earlier that year." Doc. #44, p. 28, ¶42.

After he exhausted his administrative remedies, plaintiff filed this action.

## Analysis

In the absence of evidence of direct evidence of discrimination or retaliation, plaintiff's claims are analyzed under the <u>McDonnell Douglas</u>[14] three-part test.[15] <u>Smothers v. Solvay Chems., Inc.</u>, 740 F.3d 530, 538 (10th 2014). Plaintiff bears the initial burden of establishing a prima facie case of discrimination or retaliation by a preponderance of the evidence under this burden-shifting framework. *Id*. at 539. Once he makes out a prima facie case, he creates an inference of discrimination or retaliation. *Id*. The burden then

---

[14] *McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).*

[15] *Plaintiff does not claim to have direct evidence of age discrimination or retaliation.*

shifts to the defendant to articulate a legitimate nondiscriminatory or nonretaliatory reason for the adverse employment action. *Id*. At this stage of the proceeding the defendant's burden is one of production, not persuasion. *Id*. If the defendant sustains his burden, plaintiff "bears the ultimate burden of demonstrating that [defendants'] proffered reason is pretextual." Vaughn v. Epworth Villa, 537 F.3d 1147, 1150 (10th Cir. 2008) (internal quotation marks omitted). "'[A] plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence.'" Smothers, 740 F.3d at 539 (quoting Zamora v. Elite Logistics, Inc., 478 F.3d 1160, 1166 (10th Cir. 2007)). Despite the shifting burden of production "under the McDonnell Douglas framework, the ultimate burden of proving intentional discrimination is borne by the plaintiff." EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1191-92 (10th Cir.2000).

Age Discrimination Claim

Plaintiff claims defendant failed to hire him for the BBS position because of his age. The ADEA makes it unlawful for an employer to discriminate against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To prevail on his ADEA claim, plaintiff "must prove by a preponderance of the evidence that [his] employer would not have taken the challenged action but for the plaintiff's age." Jones v. Oklahoma City Public Schools, 617 F.3d 1273, 1277 (10th Cir. 2010). This causal standard "does not require[] [plaintiff] to show that age was the sole motivating factor in the employment decision." *Id.* (internal quotation marks omitted). Rather, as long as "age was the factor that made a difference,"

an employer may be held liable under the ADEA, even "if other factors contributed to its taking an adverse action." *Id.* (Internal quotation marks omitted).

Defendant has conceded for purposes of resolving his summary judgment motion that plaintiff can establish a prima facie case of age discrimination. *See* Anaeme v. Diagnostek, Inc., 164 F.3d 1275, 1278 (10th Cir. 1999) (plaintiff must show to establish a prima facie case of discriminatory failure to hire that "(1) he applied for an available position; (2) he was qualified for the position; and (3) he was rejected under circumstances which give rise to an inference of unlawful discrimination.") (internal quotation marks omitted). The burden shifts to defendant to state a legitimate, nondiscriminatory reason for not hiring plaintiff, which defendant has done. According to Wood, the selection officer, while "Kinzie was a qualified candidate . . . Ketch was the better-qualified candidate." Doc. #44-6, p. 6, ¶27. The candidates received scores based on interviews, their resumes and references. Woods testified that he "selected Ketch to be the BSS based on the overall scoring during the selection process." *Id.* at ¶26. Plaintiff's claim therefore turns on the third McDonnell-Douglas step – pretext. The question is does the evidence, viewed in plaintiff's favor, show that a triable issue of fact exists as to whether Wood's reasons for hiring Ketch rather than plaintiff were pretextual.

Although "pretext can be shown in a variety of ways . . . [g]enerally, a plaintiff can establish pretext by showing the defendant's proffered non-discriminatory explanations for its actions are so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [they are] unworthy of belief." Conroy v. Vilsack, 707 F.3d 1163, 1172 (10th Cir. 2013) (internal quotation marks omitted). Plaintiff's argument that defendant's

explanation is pretextual is simple – "he was not just more qualified than Ketch, but extraordinarily more qualified than him."[16] Doc. #53, p.22. Plaintiff asserts Wood would have discovered this if, during the selection process, he had used a Qualifications Review Panel, had compared the candidate's resumes to the initial self-assessment questionnaires they completed which OPM reviewed[17] and had contacted his first line supervisor as a reference. Defendant responds that plaintiff essentially relies on his own subjective belief that he was the most qualified candidate to establish pretext. Defendant contends that: "Kinzie's argument is simply he was older, with more years in the workforce. Ergo, he must have had more experience and been more qualified than a younger person." Doc. #54, p. 9.

A Qualifications Review Panel might have discovered that Ketch inflated his resume as plaintiff asserts. However, its use was optional. Wood explained that he decided a QRP, which is used "to narrow your candidate pool down so the selecting official does not have to process an enormously large applicant pool," was unnecessary because of the limited number of qualified applicants. Doc. #53-1, pp. 2-3. As OPM's list of qualified candidates was "manageable, Wood decided everyone on it would be interviewed. *See*

---

[16] *The court's task in assessing plaintiff's arguments has been made much more difficult by his improper inclusion of lengthy arguments in his responses to defendant's statement of material facts.*

[17] *The questionnaire applicants completed was used to assess their qualifications for the job and "to identify the best qualified applicants to be referred to the hiring manager for further consideration and possible interviews." Doc. #44-12, p. 5.*

Doc. Nos. 53-1, pp, 2-3; 44-6, p. 4, ¶18.[18]  Plaintiff has offered conjecture, but no evidence, demonstrating that Wood's decision not to use a QRP was motivated by improper bias.[19]

Plaintiff also faults Wood for not reexamining the applicant's responses in relation to the initial self-assessment questionnaire when he was conducting his resume reviews. However, plaintiff "admit[ted] that the selecting official is not required to go behind OPM's determination."  Doc. #53, p. 8, ¶2.  Wood was entitled to rely on OPM's initial screening process and to assume that everyone on the list of candidates OPM provided, including Ketch, was qualified for the BSS position.  Pretext cannot be inferred merely from Wood's failure to look beyond the resumes.

As for the resumes themselves, plaintiff asserts that the scoring methodology Woods used when evaluating the resumes is unclear.  He contends the "subjective scoring" shows that Wood "clearly wanted to hire the younger applicant."  Doc. #53, p. 10.  Again, plaintiff offers no evidence to support his assertion of pretext.  And he fails to develop his argument regarding the alleged subjective evaluation of the resumes.  Regardless, the evidence in the

---

[18] *The suggested procedures state that a QRP would be used when the "Selecting Official determines, in collaboration with the Human Resources (HR) Specialist, a Qualifications Review Panel is needed . . . ."  Doc. #44-16, p. 1.  Plaintiff argues that Wood unilaterally made the decision not to use a QRP and "subjectively determined not to follow Defendant's own protocol for the purpose of allowing the younger candidate to move on in the selection to where he could ensure his appointment as Business Services Specialist ('BSS')."  Doc. #53, p. 8.  However, the suggested protocol did not require the selecting official to consult with the HR specialist before deciding that a QRP would not be used.  And the HR specialist at the time in question testified that whether to use the panel "was a decision for the selecting official."  Doc. #44-14, p. 2, ¶12.*

[19] *If Wood intended to discriminate against plaintiff, it is doubtful he would have used an interview panel in the selection process. An interview panel also was discretionary with the selecting official.  See supra note 8.*

record is to the contrary. Based on their resumes, Wood rated each candidate on a scale of low, medium and high. There were eight criteria by which the candidates were differentiated: coordination of business operations; point of contact of organization units; conducting reviews/studies; effective problem-solving skills; leading and/or working with groups/teams; ability to handle large, complex workload under stress; ability to communicate and effectively interact with wide spectrum of individuals and ability/willingness to learn new things and adapt to changes. Wood's notes reflect the factual bases for each candidate's rankings. *See* Doc. Nos. 44-25; 44-26.

The Tenth Circuit has concluded that pretext is typically inferred "from the employers' use of subjective evaluation criteria in the hiring process 'only when the criteria on which the employers ultimately rely are <u>entirely</u> subjective in nature.'" <u>Conroy</u>, 707 F.3d at 1178 (quoting <u>Jones v. Barnhart</u>, 349 F.3d 1260,1267-68 (10th Cir. 2003)); cf. <u>Garrett v. Hewlett-Packard Co.</u>, 305 F.3d 1210, 1217-18 (10th Cir. 2002). The criteria defendant used were not "<u>entirely</u> subjective in nature," and they explain how someone like plaintiff could have a resume score below Ketch's, even though his "[r]esume shows over 30 years of business and administrative service [and] Ketch wasn't even 30 years old at the time." Doc. #53, p. 10. Many of the skills the selecting officer was looking for were not dependent on the candidate having spent years in the workplace. Wood stated that "[t]he ability to work large complex projects under stressful conditions; interpersonal skills and ability to work with a broad diverse group of people; and the capacity to learn new things and quickly" were among the most important job skills for the BSS position. Doc.

#44, p. 18, ¶13.  Someone like Ketch could acquire these skills despite his relative youth and lack of years in the workforce.

When talking to the candidates' references, Woods again focused on the same skills he considered to be the most important for the position.  Plaintiff objects to the persons Wood contacted as his references, complaining that the people Wood spoke with had not worked with him either recently enough or long enough to be able to assess his skills.[20] Wood explained, though, how he selected the references he used.  He was attempting to get as many of the same references for the candidates as he could because he "wanted to get as close to an apples-to apples comparison as possible."  Doc. #44, p. 20, ¶18.  He was apparently unable though to find references who had recently worked closely with both Ketch and Kinzie.[21]  Plaintiff does not suggest the names of anyone who knew them both whom Wood should have, but failed to, contact.

Plaintiff does complain about Woods' failure to consult the one person whom he asserts was the most knowledgeable about his abilities – his first line supervisor, Janette Jensen.  Wood testified that that he had worked with Ms. Jensen and did not value her

---

[20]*In his brief plaintiff asserts that defendant should have contacted Jensen and O'Neill as both "were tasked with Kinzie's performance evaluations."  Doc. #53, p. 13.  He then cites to his deposition where he listed Janette Jensen and Rhonda LaFleur, but not O'Neill.  Doc. #53-3, p. 3.*

[21] *One of the persons Wood spoke with, Melanie Oliver, had not worked recently with either Kinzie or Ketch.  Plaintiff's criticism about another, D'Ann Peterson, was that she had "very little to provide in the way of constructive information concerning Kinzie as an applicant and [was] possibly a person with an axe to grind with Kinzie."  Doc. #53, p. 12. That does not demonstrate, though, that Wood's decision to use her as a reference was improper or somehow motivated by age bias, particularly when plaintiff offers no individuals who could have served as references for both him and Ketch.*

opinions or business practices.  Doc.44-6, p. 6, ¶25.  For that reason, he said he did not contact her and use her as a reference for plaintiff.  Plaintiff argues that Wood, who did contact Ketch's direct supervisor, "[went] to the horse's mouth on Ketch but not for Kinzie and chose to call only references that would be favorable to Ketch."  Doc. #53, pp. 14-15.  But he offers no evidence to substantiate this assertion.  And he admits in his response that "Woods determined not to contact Kinzie's first line supervisor[] because of a personality conflict." which he documented.  *See* Doc. Nos. 53, p. 14; #53-6, 4.  While perhaps unfortunate, it is not evidence of pretext.

Here, as in Conroy, where the Tenth Circuit confronted a hiring decision alleged to be discriminatory, the court "see[s] nothing in the decisionmaking process that would allow a reasonable jury to conclude that the process was used to discriminate against [plaintiff] on the basis of [age]." Conroy, 717 F.3d at 1172.  Plaintiff has not produced evidence showing that defendant's hiring process raises a triable dispute as to pretext.[22]  What plaintiff's claim essentially boils down to is his belief that he was better qualified for the position.  He asserts that he has "had over 30 years of business [and other] experience," while, as he "understand[s] Mr. Ketch, most of his experience was in range land management and his college degree was in range land management."  Doc. #53-3, p. 4.  But plaintiff's subjective opinion about his qualifications is insufficient to create a material fact dispute.  *See* Santana v. City & Cnty. of Denver, 488 F.3d 860, 865-66 (10th Cir.

---

[22] *Plaintiff asserts that "[t]he only semi-objective measure in the entire process was the interview which was scored a tie by Wood . . . ."  Doc. #53, p. 16, ¶9.  However, Ketch's raw interview score was higher.  Ketch and Kinzie tied only after Wood converted the scores to his 1-3-5 scale.  See Doc. 44, p. 19, ¶16.*

2007); Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1329 (10th Cir.1999), *overruled on other grounds* by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002)).  More importantly, plaintiff has not produced evidence supporting an inference that he was overwhelmingly more qualified than Ketch with respect to the qualifications which the selecting officer identified as being among the most important for the position.  *See* Conroy, 707 F.3d at 1172 (pretext will not be inferred "based upon 'minor differences between plaintiff's qualifications and those of successful applicants;' rather, there must be 'an overwhelming merit disparity.'") (quoting Santana, 488 F.3d at 865).

Plaintiff relies on the opinion of his former first line supervisor, Janette Jensen, as evidence of his superior qualifications and Ketch's lack of qualifications.  The problem is that Ms. Jensen also did not evaluate plaintiff in terms of the particular skills Wood was looking for to fill the BSS position.  Her conclusion that plaintiff had "the knowledge and experience necessary to do the job of Business Services Specialist that is far superior to that of the individual who was selected" is based on the qualifications reflected in the assessment questions on the on-line questionnaire which the applicants initially completed. *See* Doc. # 53-5, pp. 5-7.

Ms. Jensen essentially disagrees with the OPM's conclusion that Ketch was qualified for the BSS position.  But neither Ms. Jensen nor plaintiff provide more than general criticisms of Ketch's job skills.  Ms. Jensen states that she previously performed some of the duties required of the position and knew that "someone in the position of a Rangeland Management Specialist in the field, would not have the experience required for

the BSS job. Mr. Ketch might have some knowledge, but not the necessary experience." Doc. #53-5, p. 6. Plaintiff testifies that his "objection is that it's unclear to me how a range management specialist who works in the field with farmers would have these kind[s] of qualifications." "I've got 30 years experience in business and he has his experience in range land management." Doc. Nos. 53-3, p. 9; 59, p. 21. Neither, though, directs the court to specific deficits in Ketch's knowledge or experience which demonstrate the significant merit disparity required to permit an inference of pretext to be drawn. And as has been discussed, Wood was entitled to accept, without further evaluation, the qualifications of any person listed on the Certificate of Eligibles. *See* Conroy, 707 F.3d at 1173 ("Moreover, a Forest Service human-resources specialist certified Mr. Hager as qualified for the position, (Certification of Candidates, dated Nov. 9, 2001)—a certification that the selecting official, Mr. Pyron, was entitled to rely upon.") (internal citation omitted); *see generally* Santana, 488 F.3d at 865 ("Once applicants reached the interview process, the panelists were free to select any of the candidates in the group without regard to [assessment] scores.").

Defendant offered a legitimate, nondiscriminatory reason for his decision to hire someone other than plaintiff for the BSS position. Plaintiff has not offered evidence "sufficient to raise a genuine doubt about [the Department of Agriculture's] motivation in selecting" Ketch. Conroy, 707 F.3d at 1178 (quoting Santana, 488 F.3d at 866). Here, as in Conroy, "'the evaluation system . . . was transparent and reflected that all listed employees were evaluated according to the same criteria . . . and assessed in non-

discriminatory terms.'" *Id.* (quoting Hinds v. Sprint/United Mgmt. Co., 523 F.3d 1187, 1200 (10th Cir. 2008). The court therefore rejects plaintiff's age discrimination claim.

Retaliation claim

Plaintiff claims defendant retaliated against him by changing his 2015 performance evaluation because he filed an age discrimination complaint. "[A]n employer may not retaliate against an employee 'because he has opposed any practice made an unlawful employment practice' by Title VII." Vaughn, 537 F.3d at 1151 (quoting 42 U.S.C. § 2000e-3(a)). To make out a prima facie case of retaliation under McDonnell Douglas, plaintiff must show: "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." Conroy, 707 F.3d at 1181 (internal quotation marks omitted). Defendant concedes plaintiff has met this initial burden.[23] Defendant must therefore state a legitimate, nonretaliatory reason for the adverse action, which he has done. O'Neill testified that he did not believe plaintiff should be given an exceeds rating in customer service when so many employees complained about plaintiff's handling of their building complaints during the 2015 rating year. At this point "[t]he defendant need not persuade the court that it was

---

[23] *It is not altogether clear to the court that there was actually an "adverse action" here. As noted previously, it is undisputed that an employee's performance evaluation is not final until the reviewing official, here, O'Neill, approved it. So the adverse action plaintiff relies on is essentially him not getting the benefit of a preliminary, non-final evaluation of a subordinate supervisor. It is less than obvious that such a circumstance constitutes an adverse action but, in light of defendant's concession that a prima facie case has been made out, it is unnecessary to belabor the question here.*

actually motivated by the proffered reasons. <u>Anaeme</u>, 164 F.3d at 1279. All the employer must do to satisfy his burden is to "'produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus.'" *Id.* (quoting <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 257 (1981). "'[T]he determination that a defendant has met its burden of production . . . involve[s] no credibility assessment.'" *Id.* (quoting <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 509 (1993)).

To defeat summary judgment plaintiff must offer sufficient evidence to raise a genuine doubt about O'Neill's motivation for the actions he took which are viewed as adverse to plaintiff. Although a close question, considering the evidence in the aggregate and in the light most favorable to plaintiff, the court concludes plaintiff has met his burden. A reasonable jury could determine that defendant's proffered explanation is pretextual.

While O'Neill asserts he discussed the complaints with plaintiff in the summer and fall of 2015 and that plaintiff participated in some of the meetings where the complaints were aired, plaintiff denies having any discussions with O'Neill about his performance "until after fiscal year 2015." Doc. #53-3, p. 16. Plaintiff also denies that any employees ever indicated to him that they thought he was doing anything wrong. *Id.* at p. 13. There is evidence O'Neill did not discuss the issues with plaintiff's performance with plaintiff's direct supervisor, Janette Jensen, and evidence that she spoke "with some other individuals, too, throughout the State, who said that things were fine." Doc. #53-9, p. 8. Finally, the documentation which substantiates defendant's position that employees complained about plaintiff's performance was all obtained after the asserted retaliatory action was taken.

Plaintiff's evidence, while not overwhelming, is sufficient for a reasonable jury to question defendant's reason for lowering plaintiff's performance appraisal from the one he might otherwise have gotten. A trial is therefore warranted on plaintiff's retaliation claim.

Accordingly, the court concludes defendant's motion for summary judgment [Doc. #44] should be **GRANTED IN PART** and **DENIED IN PART**. Defendant is **GRANTED** summary judgment on plaintiff's ADEA discrimination claim and **DENIED** summary judgment on plaintiff's retaliation claim. Summary judgment in defendant's favor on the discrimination claim will be entered when the case is concluded as to all claims. Fed.R.Civ.P 54(b).

**IT IS SO ORDERED**

Dated this 19th day of July, 2018.

JOE HEATON
CHIEF U.S. DISTRICT JUDGE